Slip Op. 14-88

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————  :
CLEARON CORP.,                                         :
and OCCIDENTAL CHEMICAL CORP.,          :
                                                                       :
                      Plaintiffs,                               :
                                                                       :
                      and                                         :    Before: R. Kenton Musgrave, Senior Judge
                                                                       :
JUANCHENG KANGTAI CHEMICAL CO.      :    Consol. Court No. 13-00073
LTD., HEBEI JIHENG CHEMICAL CO., LTD.,  :
and ARCH CHEMICALS, INC.,                      :
                                                                       :
                      Consolidated-Plaintiffs,          :
                                                                       :
                      v.                                           :
                                                                       :
UNITED STATES,                                           :
                                                                       :
                      Defendant,                               :
                                                                       :
                      and                                         :
                                                                       :
ARCH CHEMICALS, INC.,  and JUANCHENG  :
KANGTAI CHEMICAL CO., LTD.,                  :
                                                                       :
                      Defendant-Intervenors.  :
                                                                       :
———————————————————  :

## OPINION AND ORDER

[On sixth administrative review of antidumping duty order on chlorinated isocyanurates, requests for voluntary remand granted, and motions for judgment on the agency record granted in part.]

Dated: July 24, 2014

*James R. Cannon, Jr.* and *Thomas M. Beline*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the plaintiffs.

*James K. Horgan*, *John J. Kenkel*, and *Gregory S. Menegaz*, DeKieffer & Horgan, of Washington, DC, for the consolidated-plaintiff and defendant-intervenor Juancheng Kangtai Chemical Co., Ltd.

*Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington, DC, for the consolidated-plaintiff Hebei Jiheng Chemical Co., Ltd. and the consolidated-plaintiff and defendant-intervenor Arch Chemical Co., Ltd.

*Jane C. Dempsey*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  On the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *David W. Richardson*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington DC.

Musgrave, Senior Judge:   This opinion addresses challenges to *Chlorinated Isocyanurates From the People's Republic of China*, July 18, 2014. Reg. 4386 (Jan. 22, 2013), PDoc 169 ("*Final Results*"), the sixth administrative review of an antidumping duty ("AD") order on chlorinated isocyanurates[1] from the People's Republic of China ("PRC") conducted by the International Trade Administration of the U.S. Department of Commerce ("Commerce").  Before the court in this consolidated action[2] are three motions for summary judgment on the agency record brought under USCIT Rule 56.2.   One motion is brought by the consolidated-plaintiff and

---

[1]   The "subject merchandise" are all chlorinated isocyanurates.  These are derivatives of cyanuric acid and consist of three primary compositions, trichloroisocyanuric acid, sodium dichloroisocyanurate, and sodium dichloroisocyanurate.  Subject merchandise are available in powder, granular, and tableted forms and are created in three steps, first making the intermediate inputs cyanuric acid, caustic soda and chlorine gas, second combining these inputs, and third "shaping the finished products."  Issues and Decision Memorandum for the *Final Results*  (Jan. 14, 2013), PDoc 164 ("I&D Memo") at cmt. 1.

[2]   *Juancheng Kangtai Chemical Co., Ltd. v. United States*, Court No. 13-00056 and *Arch Chemicals, Inc. et al v. United States*, Court No. 13-00061, have been consolidated into this action, now styled *Clearon Corporation et al v. United States,* Consol. Court No. 13-00075.  *See* Order (Apr. 22, 2013), ECF No. 20.

defendant-intervenor Arch Chemicals Inc. ("Arch"), an importer of the subject merchandise, and by

the consolidated-plaintiff Hebei Jiheng Chemical Co., Ltd. ("Jiheng"), a producer and exporter of

the subject merchandise from the PRC.[3]  A second motion is brought by the consolidated-plaintiff

and defendant-intervenor Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"), a producer and

exporter of the subject merchandise from the PRC.[4]  The third motion is brought by the plaintiffs

Clearon Corp. and Occidental Chemical Corp., U.S. producers of domestic like product (together

"Clearon").[5]  Collectively, the motions contest ten aspects of the *Final Results*: Commerce's (1)

calculation of the selling, general, and administrative expense financial ratio ("SG&A ratio") using

data pertinent to the Philippines, (2) alleged use of a 2011 financial statement not on the record, (3)

treatment and calculation of intra-company transportation of intermediate products, (4) application

of new methodology for valuing ammonia gas and sulfuric acid by-products, (5) selection of the

Philippines as the primary surrogate country, and the surrogate value selection for (6) chlorine, (7)

hydrogen gas, (8) sodium hydroxide, (9) electricity, and (10) urea.

Commerce asks the court to grant voluntary remand for three of its determinations,

namely (1) its calculation of the SG&A ratios using Philippine data, (2) its calculation of

---

[3]  Mot. for Judgment on the Agency R. pursuant to Rule 56.2 by Consol. Plaintiffs Arch Chemicals, Inc. and Hebei Jiheng Chemical Co., Ltd. (Aug. 15, 2013), ECF No. 27 ("Arch & Jiheng Rule 56.2 Mot.").  Arch had also intervened herein on the side of the defendant.  *See* Arch's Mot. to Int. as a Matter of Right, Court No. 13-00073 (Apr. 16, 2013), ECF No. 12.

[4]  Mot. for Judgment on the Agency R. pursuant to Rule 56.2 by Consol. Pl.'s Juancheng Kangtai Chemical Co., Ltd. (Aug. 15, 2013), ECF No. 30 ("Kangtai Rule 56.2 Mot."). Kangtai had also intervened herein on the side of the defendant.  Kangtai's Mot. to Int. as a Matter of Right, Court No. 13-00073 (Apr. 24, 2013), ECF No. 21.

[5]  Mot. for Judgment on the Agency R. pursuant to Rule 56.2 by Pl.'s Clearon Corp. and Occidental Chemical Corp. (Aug. 15, 2013), ECF No. 31 ("Clearon Rule 56.2 Mot.").

intra-company transportation of intermediate products, and (3) its by-product valuation methodology, and it opposes the remaining issues of the three Rule 56.2 motions.[6] Arch and Kangtai contest three aspects of Clearon's Rule 56.2 motion, and in doing so argue that Commerce's surrogate value selection for urea and hydrogen gas was the best available information on the record and that Clearon failed to exhaust administrative remedies concerning its by-product claims.[7]

For the reasons below, the court grants the three voluntary remand requests and also orders remand on the issue of surrogate country selection from the *Final Results*.

## I. *Jurisdiction and Standard of Review*

Final administrative AD review determinations are evaluated under 19 U.S.C. §1516a(b)(1)(B)(i). Commerce's determinations, findings, or conclusions are sustained unless they are found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *NSK Ltd. v. United States*, 481 F.3d 1355, 1359 (Fed. Cir. 2007), citing 19 U.S.C. §1516a(b)(1)(B)(i)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence is "more than a mere scintilla", it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. V. NLRB*, 340 U.S. 474, 477 (1951), citing *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

---

[6] Def's Resp. to Pl.'s and Consol. Pl.'s Rule 56.2 Mot.'s for Judgment on the Agency R. (Feb. 24, 2014), ECF No. 49 ("Def's Resp.").

[7] *See* Def. Int. Arch Chemicals, Inc. Resp. to Pl.'s Clearon and Occidental's Rule 56.2 Mot. For Judgment on the Agency R. (Feb. 24, 2014), EFC No. 46 ("Arch Resp."); *see also* Def. Int. Kangtai Chemicals, Co., Ltd. Resp. to Pl.'s Clearon and Occidental's Mot. For Judgment on the Agency R. (Feb. 24, 2014), EFC No. 50 ("Kangtai Resp.").

In determining if Commerce's interpretation of a statute is in accordance with law, the court applies a two-step analysis set forth by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).   First, the court examines whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Id.*   Second, if the statute is silent to the specific issue or the legislative intent is not clear, the court must determine "whether the agency's answer is based upon a permissible construction of the statute." *Id.* at 843-44.   *See also*, *e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359-60 (Fed. Cir. 2007). The court provides the agency deference on interpreting the statutes the agency administers and has found that "[a]ny reasonable construction of the statute is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004), citing *Torrington v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

## II. *Background*

Commerce initiated the review covering four producers/exporters of the subject merchandise from the PRC and selected Jiheng and Kangtai as the two mandatory respondents in the review.[8]   Commerce's Office of Policy issued a Surrogate Country Memorandum as part of the review which included the following "non-exhaustive" list of six potential surrogate countries that it determined were "most likely to have good data availability and quality" and were "at a level of

---

[8] *See Initiation of Antidumping Administrative Reviews*, 76 Fed. Reg. 45227, 45229 (July 28, 2011).   The review covered Jiheng, Kangtai, Nanning Chemical Industry Co., Ltd., and Zhucheng Taisheng Chemical Co., Ltd. for the period of June 1, 2010 through May 31, 2011.

economic development comparable to [the PRC] in terms of *per capita* gross national income" for

the review based on figures from the World Bank's 2011 World Development Report:

| Country | Per Capita GNI, 2009 ($USD) |
|---|---|
| PRC | 3,590 |
| Philippines | 1,790 |
| Indonesia | 2,230 |
| Ukraine | 2,800 |
| Thailand | 3,760 |
| Columbia | 4,930 |
| South Africa | 5,770 |

*See Memorandum to Mark Hoadley, Request for a List of Surrogate Countries for an Administrative*

*Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic*

*of China* (Sep. 9, 2011), PDoc 37 ("Surrogate Country Memorandum"), referencing World

Development Report 2011, World Bank.  Commerce asked the parties to comment on the surrogate

country selection and provide it with information for valuing factors of production.  In response, the

parties submitted surrogate country comments and surrogate value data from India, Thailand, the

Philippines, and South Africa.[9]

Commerce published its preliminary results and selected South Africa as the primary

surrogate country for valuing factors of production, finding it was the largest exporter of comparable

---

[9]  In its comments Kangtai offered Thailand and the Philippines as potential surrogate countries and noted that India had been the surrogate country for the first five reviews, that Commerce had removed India from the potential surrogate list, and that Commerce rarely selects a surrogate country that is not included in the list. *See* Kangtai's Sur. Country Cmts. (Dec. 19, 2011), PDoc 58 at 2-3.  Arch commented that Thailand and the Philippines were the best surrogate countries options.  *See* Arch Sur. Country Cmts. (Jan. 9, 2012), PDoc 55 at 2.  Clearon commented that South Africa was the best surrogate choice. *See* Clearon Sur. Country Cmts. (Dec. 19, 2011), PDoc 57 at 3.  *See also,* Jiheng Sur. Value Sub. (Jan. 9, 2012),  PDoc 65; Clearon Sur. Value Sub. (Jan. 9, 2012),  PDoc 66; Kangtai Sur. Value Sub. (Jan. 9, 2012), PDocs 69, 70; Kangtai Sur. Value Sub. for Final Results, (Sept. 5, 2012), PDocs 116, 117.

merchandise among the countries on the potential surrogate list.  For factors of production ("FOPs") where data was not placed on the record from South Africa or other countries on the list, Commerce relied on India data stating that it was the only alterative on the record, and that "even though India is not on the list of possible surrogate countries in the Surrogate Country Memorandum, India is a significant producer of comparable merchandise that has the data needed to calculate certain surrogate values." *See Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 41746, 41479 (July 16, 2012) ("*Preliminary Results*") (citation omitted).

Commerce received comment and rebuttal briefs from the parties including a brief from Kangtai claiming India should be selected as the primary surrogate country or in the alternative South Africa should be selected.  *See* Kangtai Rebuttal Brief at 1-2 (Dec. 10, 2011), PDoc 159. Commerce then issued its *Final Results* and choose the Philippines as the primary surrogate country, finding that it is economically comparable to the PRC, that it is a significant producer of comparable merchandise, and that the record now contained Philippine surrogate value data for all but one factor of production (steam).  I&D Memo at cmt. 2.  Responding to Kangtai's argument that India was the appropriate surrogate country, Commerce stated that when selecting a primary surrogate country it will normally first look to the potential surrogate list in the Surrogate Country Memorandum, and that "the list did not include India because India's *per capita* GNI did not fall within the range of countries proximate to the PRC." *Id.*

### III. *Claims*

The first claim of Arch, Jiheng and Kangtai challenges Commerce's decision to treat employment and retirement benefits as SG&A instead of labor expenses when calculating the financial ratios. The parties aver that Commerce's determination is not supported by substantial evidence, that Commerce failed to provide an adequate explanation for its determination, and that its decision resulted in the double-counting of certain labor costs contrary to Commerce's stated policy. *See* Arch & Jiheng Rule 56.2 Mot. at 21-24; *see also* Kangtai Rule 56.2 Mot. at 31-38. Second, Kangtai argues Commerce erred in calculating the financial ratio by relying a 2011 financial statement not on the record.  Kangtai Rule 56.2 Mot. at 38-39.

In the third claim, Arch and Jiheng argue Commerce acted contrary to law by applying a new methodology for valuing intra-company transportation when calculating normal value in the *Final Results* without providing notice, or giving the parties an opportunity to comment, or providing the parties an opportunity to place requisite information on the record.  The parties further claim Commerce failed to provide a reasoned explanation for the change in methodology. Arch & Jiheng Rule 56.2 Mot. at 31-35.

Fourth, Clearon, Kangtai, Arch and Jiheng challenge Commerce's valuation of the subject merchandise's by-product offsets, ammonia gas and recovered sulfuric acid, which are converted to produce ammonium sulfate.  All parties claim Commerce changed its methodology for by-product valuation from the *Preliminary Results* to the *Final Results* without providing a reasoned explanation or support for its change in practice.  Clearon contends that Commerce failed to account for the costs associated with converting ammonium gas to ammonium sulfate, that it ignored the language of its own questionnaire, that it disregarded its regulations, and that it permitted Jiheng and

Kangtai to reduce their antidumping duty margins by withholding data.  Clearon Rule 56.2 Mot. at

20-25.  Arch and Jiheng claim Commerce made the change without providing the parties notice and

an opportunity to comment and place requisite information on the record.  Arch & Jiheng Rule 56.2

Mot. at 8-12, 24.  Kangtai alleges that the determination was unlawful and unreasonable, that no

party argued for the change in methodology, and that Commerce should apply the methodology it

used in the *Preliminary Results*.  *See* Kangtai Rule 56.2 Mot. at 38-40; Kangtai Resp. at 6-8; Cons.

Pl. Kangtai Chemicals, Inc. Reply Br. in Support of its Mot. for Judgment on the Agency R. (April

23, 2014), EFC No. 59 ("Kangtai Reply") at 9-11.

    In the fifth claim, Kangtai challenges Commerce's surrogate country selection

methodology and contends that India is economically comparable to the PRC.  Kangtai argues that

Commerce's reliance on *per capita* GNI to determine economic comparability is unreasonable, and

that the methodology it applied to select economially comparable countries, as well as its decision

to eliminate India from the list of economically comparable countries, is not supported by substantial

evidence and is not in accordance with law.  Kangtai Rule 56.2 Mot. at 6-11; Kangtai Reply at 1-9.

    The final five claims challenge Commerce's surrogate value selections for various

factors of production.  In the sixth claim, Clearon avers Commerce's surrogate value selection for

hydrogen gas is unsupported by substantial evidence and contrary to law.  Clearon argues that the

Philippine GTA import data Commerce used to value Jiheng's hydrogen gas by-product is

aberrational and unreliable, and that Commerce should have instead relied on domestic data from

India. Clearon Rule 56.2 Mot. at 16-20. Seventh, Kangtai claims that Commerce's surrogate value

selection for chlorine was not the best available information on the record and that it was not

supported by substantial evidence.  Kangtai avers that selected surrogate value was based on a small

quantity of imports into the Philippines and that Commerce should have instead used Indian chlorine and caustic soda data to value chlorine. Kangtai Rule 56.2 Mot. at 11-27.  In the eighth claim Clearon alleges that Commerce erroneously determined urea was not produced in the Philippines, and that instead of relying upon Philippine GTA import statistics to value urea Commerce should have used Philippine Bureau of Agricultural Statistics data.  Clearon contends Commerce's rejection of the Philippine Bureau of Agricultural Statistics domestic prices for urea is not supported by substantial evidence and is contrary to law.  Clearon Rule 56.2 Mot. at 11-16.  Ninth, Jiheng and Kangtai claim that Commerce's reliance on the Philippine *Doing Business in the Camarines Sur* rates to value electricity is not supported by substantial evidence on the record, and that the Philippine *Meraloc* data is the best available information on the record to value electricity. Kangtai Rule 56.2 Mot. at 40-42; Arch & Jiheng Rule 56.2 Mot. at 15-21.  In the tenth claim Kangtai challenges Commerce's surrogate value selection for sodium hydroxide.  Kangtai argues that Commerce should have made a downward adjustment to reflect Kangtai's lower consumption of sodium hydroxide, and that Commerce's decision not to adjust the value is unsupported by substantial evidence.  Kangtai's Rule 56.2 Mot. at 27-31.

Defendant intervenors Arch and Kangtai support Commerce's determination in opposing three aspects of Clearon's Rule 56.2 Motion. Arch and Kangtai both oppose Clearon's contention that Commerce's did not use the best available information for its surrogate value selection for urea and argue that Commerce's determination is supported by substantial evidence. Kangtai Resp. at 2-6; Arch Resp. at 3-5.  The two parties also argue Clearon failed to exhaust administrative remedies concerning its claim that the two parties responses were insufficient for the proper by-product valuation of ammonium sulfate.  Kangtai Resp. at 7-8; Arch Resp. at 8-10.  Arch

further opposes Clearon's claim that the selected surrogate value for hydrogen gas was not the best available information on the record and argues Commerce's determination was supported by substantial evidence.  Arch Resp. at 5-8.

IV.  <em>Statutory and Regulatory Framework</em>

In an AD administrative review Commerce determines if the subject goods will likely be sold at a less than fair value in the United States.  In making this determination, Commerce calculates the "dumping margin" by subtracting the foreign product's price in the United States, the "export price", from the price in the producer's home country, the "normal value".  *See* 19. U.S.C. §1675(a)(2)(A); 19 U.S.C. §1673; 19 U.S.C. §1677(35)(A).  When determining the normal value of subject goods from a nonmarket economy ("NME") such as the PRC, Commerce makes its calculation based on "surrogate values" which are the "value of the factors of production" from surrogate market economy country data.  *See* 19 U.S.C. §1677b(c)(1).

To value factors of production Commerce must use the "best available information" from the production and sales data it obtains from the parties in the administrative review on the record. 19 U.S.C. §1677b(c)(1).  Commerce uses "to the extent possible" data from "one or more" surrogate market economy countries that are (1) "at a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise."  19 U.S.C. §1677b(c)(4).  Commerce has a regulatory preference for valuing all factors of production, with the exception of labor, from one surrogate country. 19 C.F.R. §351.408(c)(2).

V.  *Discussion*

A.  Commerce's Requests for Voluntary Remand

The first three issues before the court concern Commerce's requests for voluntary remand for three of its determinations in the *Final Results*.  First, Commerce requests voluntary remand to address party comments in the first instance concerning its financial ratio calculation using Philippine data.  Second, it seeks remand to explain its changed methodology for determining the by-product valuation of ammonia gas and sulfuric acid.  In its third request Commerce seeks remand to explain its change in methodology for its treatment and calculation of intra-company transportation of intermediate products.

The court has discretion over whether to grant remand when, as in the instance case, an agency requests the remand without confessing error to reconsider its position, and such requests are generally granted if the agency's concerns are found to be substantial and legitimate.  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028-29 (Fed. Cir. 2001) ("*SKF I*"); *see also Nucor Corp. v. United States*, 33 CIT 207, 292, 612 F. Supp. 2d 1264, 1336 (2009).  Concerns have been found to be substantial and legitimate when (1) the agency has a compelling justification for the remand, (2) the justification for the remand is not outweighed by the need for finality, and (3) the scope of the remand is appropriate.  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 37 CIT___, 882 F. Supp. 2d 1377, 1381 (2013), referencing *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 29 CIT 1516, 1522-26, 412 F. Supp. 2d 1330, 1336-39 (2005).  Requests that are frivolous or made in bad faith, including those that compromise legitimate concerns for finality,

are based on non-binding policy statements, or are merely legal tactics applied to avoid judicial

review, may be denied.[10]

      1.  Calculation of Financial Ratio

              Kangtai, Arch, and Jiheng contend Commerce failed to follow its stated practice for

adjusting financial statements and this resulted in the improper calculation of the financial ratio in

the *Final Results*. The parties argue that the ILO wage rate Commerce used to value the labor FOP

includes labor, retirement, and employee benefit expenses, and that these expenses will be double

counted if Commerce does not adjust the financial ratio to correctly reflect the financial statements.

Kangtai Rule 56.2 Mot. at 31-38; Arch & Jiheng Rule 56.2 Mot. at 21-24.  In its first remand

request, Commerce does not admit that it erred in its calculation of the SG&A financial ratio, but

contends that as a result of the number of possible surrogate countries that existed after the

*Preliminary Results*, Kangtai, Arch, and Jiheng did not get the opportunity to comment on the

calculation and Commerce did not have the opportunity to respond to comments.  Commerce asks

to address these comments in the first instance and accordingly "respectfully request[s] the Court

remand the financial ratio calculation issue for Commerce to reconsider the SG&A financial ratio

calculation in light of the comments concerning the alleged overstatement of labor in the normal

value calculation".  It claims that the court would not "be able review Commerce's determination,

---

[10]  *See Gleason Indus. Products, Inc. v. United States*, 31 CIT 393, 396 (2007), referencing
*Corus Staal, BV v. U.S. Dep't of Commerce*, 27 CIT 388, 391, 259 F. Supp. 2d 1253, 1257 (2003)
(suggesting "merely a change in policy" will not justify a voluntary remand over an interested
party's objection), and *Lutheran Church--Missouri Synod v. Fed. Communications Comm'n*, 141
F.3d 344, 349 (D.C. Cir. 1998) (refusing to grant a "novel, last second motion to remand" which was
based on a prospective policy statement that did not bind the FCC and stating that "the Commission
has on occasion employed some rather unusual legal tactics when it wished to avoid judicial review,
but this ploy may well take the prize").

if the interested parties and Commerce have not in the first instance raised, considered and addressed the arguments." Def's Resp. at 51-52.

Commerce has a substantial and legitimate concern for requesting remand. Correcting a possibly inaccurate determination of normal value is a compelling reason for a remand request.[11] The need for finality in this instance is also not outweighed by the concern of protecting the administrate review from material inaccuracy. Further, Commerce has limited its request to the financial ratio calculation and this scope is appropriate. It does not appear Commerce's substantial and legitimate concern is frivolous or in bad faith, and Commerce's request for remand to reconsider the SG&A financial ratio calculation is granted. On remand, Commerce is requested to address the arguments as raised in the parties' briefs before the court.

Kangtai alleges that Commerce further erred in its financial ratio calculation by relying on a 2011 financial statement for Mabuhay Vinyl Corporation ("MVC"), a Philippine producer of sodium hypochlorite, that is not on the record. Kangtai Rule 56.2 Mot. 38-39, referencing App'x III.45, Surrogate Value Memorandum ("surrogate value chart"). Although Commerce references MVC's "2011" financial statement in the surrogate value chart, this reference

---

[11] Kangtai argues the court should not grant remand for Commerce to "consider these comments" on the "alleged overstatement of labor", but instead asks for remand to Commerce "to make the adjustments it said it would make but failed to execute" in the review which are consistent with its *Labor Methodologies* and its final determinations in *Stainless Steel Sinks* and *Certain Steel Nails*. Kangtai Reply at 20-21, referencing *Drawn Stainless Steel Sinks From the People's Republic of China: Investigation, Final Determination*, 78 Fed. Reg. 13019 (Feb. 26, 2013) and accompanying issues and decision memorandum at cmt. 4, and *Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review,* 79 Fed. Reg. 19316 (Apr. 8, 2014) and accompanying issues and decision memorandum at cmt. 2. In response, Commerce asks in its remand request to address the comments made by both Jiheng and Kangtai concerning the SG&A financial ratio. The language of the request is appropriate and encompasses the concerns Kangtai raise in its comments on this issue.

is merely a typographical error.  The record supports Commerce's claimed reliance on the 2010

MVC financial statement[12] in its calculation of the financial ratio.

      The court recognizes a presumption of administrative legality and regularity in AD

cases, and presumes that if the 2011 MVC had been submitted to Commerce it would have been

included on the record.[13]  There is no indication in the papers before the court that a 2011 MVC

financial statement was ever submitted to Commerce, nor do any of the parties argue that it ever was

part of the administrative record.  Commerce cites to its reliance on the 2010 MVC financial

statement in its *Final Results*,[14] and the numbers stated by Commerce in the surrogate value chart

correspond to the numbers in the 2010 MVC financial statement.[15]  The record accordingly does not

support Kangtai's assertions that Commerce used a 2011 MVC financial statement, and Commerce's

explanation with respect to the financial statement that it did rely upon is reasonable.

---

[12]   Jiheng Sur. Value Sub. (Jan. 9, 2012), PDoc 65 at Tab 4 ("2010 MVC Financial Statement").

[13]   *See* 19 U.S.C. §1516a(b)(2)(A) (documents presented or obtained by Commerce are included as part of the administrative record); *see also Bohler-Uddeholm Corp. v. United States*, 20 CIT 1336, 1343, 946 F. Supp. 1003, 1009 n.18 (1996) (citations omitted).

[14]   I&D Memo at cmt. 13, referencing 2010 MVC Financial Statement.

[15]   *See, e.g.*, the identical figures in: the 2010 MVC Financial Statement "Consolidated Statements of Income -- Net Sales" section and the "Sales" line of the surrogate value chart (1,217,602,316 PHPs); the 2010 MVC Financial Statement "Consolidated Statements of Income -- Cost of Sales" section and the "Cost of Sales" line in the surrogate value chart (863,303,184 PHPs); the 2010 MVC Financial Statement "Consolidated Statements of Income -- Direct Labor" section and the "Direct Labor" line on the surrogate value chart (26,437,846 PHPs).

2.  Change in Methodologies

In its second and third requests Commerce seeks voluntary remand to explain its change in methodology, consider comments by the parties, and collect additional relevant information if necessary, for its valuation of the by-products ammonia gas and sulfuric acid and its calculation of intra-company transportation.  Def's Resp. at 53-54.  Although adherence to previous methodology may be required in some instances, a change in Commerce's practice or methodology may be permitted in an administrative review if the change is for an adequate cause, if Commerce provides a reasoned explanation, and in making this change Commerce provides parties with timely notice and sufficient opportunity to provide the information required by the revised methodology.[16]

a.  Calculation of Intra-Company Transportation of Intermediate Products

Commerce requests remand "to reconsider and explain its treatment and calculation of intra-company transportation" of intermediate products in response to Arch and Jiheng's challenge of its methodology, and its concern is both substantial and legitimate.  *See* Def's Resp. at 54, referencing I&D Memo at cmt. 16.  In the *Final Results*, Commerce changed the methodology it applied for valuing the intra-company transportation of intermediate products, treating it as a separate factor of production rather than considering it to be included in overhead as it did in its *Preliminary Results*, without justifying this change.  *Id.*  The need for an agency to adequately

---

[16] *See, e.g.*, *Arch Chemicals, Inc. v. United States*, 33 CIT 954, 963-64 (2009); *Anshan Iron & Steel Co., Ltd. v. United States*, 27 CIT 1234, 1241-42 (2003); *Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1169-70, 178 F. Supp. 2d 1305, 1326-27 (2001); *Hussey Copper, Ltd. v. United States*, 17 CIT 993, 998, 834 F. Supp. 413, 419 (1993); *Shikoku Chemicals Corporation v. United States*, 16 CIT 382, 388, 795 F. Supp. 2d 417, 421 (1991).

address a departure from past practice is a compelling justification for a remand request.[17]  The

concern addressed by Commerce in its request, ensuring consistency in AD proceedings, is not

outweighed by the need for finality.[18]  Explaining a change in methodology for the calculation of

one FOP is an appropriate scope for a remand request.  There is no indication Commerce's

substantial and legitimate concern is frivolous or in bad faith. Commerce's remand request is

granted.  On remand, Commerce is requested to collect additional relevant information if necessary,

provide the parties an opportunity to comment on any new additional information, and provide an

explanation that addresses the parties comments either in their briefings if no additional information

is collected or as may be submitted to Commerce.

     b.  By-Product Valuation Methodology

        Commerce claims that it changed its by-product valuation methodology for ammonia

gas and sulfuric acid from the *Preliminary Results* to the *Final Results* without providing an

explanation for the change.[19]  Clearon, Kangtai, and Arch all challenged the determination in their

---

[17] *See SKF USA Inc. v. United States*, 31 CIT 951, 959, 491 F. Supp. 2d 1354, 1362 (2007) ("it is within Commerce's expertise and discretion to update its methodology for both increased accuracy and ease of use") (citation omitted); *see also Shakeproof Assembly*, *supra*, 29 CIT at 1522, 412 F. Supp. 2d at 1336, referencing *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. Of Trade*, 412 U.S. 800, 808 (1973) ("it is an established principle of administrative law that an agency has a 'duty to explain its departure from prior norms').

[18] *See Allied Tube & Conduit Corp. v. United States*, 29 CIT 502, 508, 374 F. Supp. 2d 1257, 1262 (2005) ("Commerce must explain why it chose to change its methodology and demonstrate that such change is in accordance with law and supported by substantial evidence") (citation omitted); *see also Hussey Copper, Ltd.*, 17 CIT at 998, 834 F. Supp. at 419 (requiring remand on the ground that Commerce "failed to adequately articulate the reasons for its departure from its normal practice").

[19] Commerce claims it valued ammonia gas and sulfuric acid with individual surrogate values for each by-product in the *Preliminary Results*, and in the *Final Results* valued the two by-
(continued...)

motions,[20] and Commerce "respectfully requests a voluntary remand . . . to consider these comments, provide an explanation and collect additional relevant information if necessary." Def's Resp. at 53-54, referencing *SKF I*, *supra*, 254 F.3d at 1029.   Kangtai, however, opposes its request for remand arguing that contrary to Commerce's claims the record contains the information necessary for valuing the two by-products, as evidenced by Commerce's calculation of the surrogate value costs in the *Preliminary Results*.   It asks the court to restore the *Preliminary Results'* treatment of Kangtai's by-product on remand.   Kangtai Reply at 9-10, referencing Def's Resp. at 53-54.[21] Kangtai also opposes remand on the grounds that Commerce excessively delayed briefing on the issue and that it did not properly brief the merits of its request.   *Id.* at 10-11.

---

[19] (...continued)
products by using the value of the down-stream product ammonium sulfate. *See* Def's Resp. at 53-54, referencing *Preliminary Results*; *see also* I&D Memo at cmt. 14 (stating "[w]e are adjusting the manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the Department's recent practice. [Commerce] considers this by-product methodology more reasonable than the by-product methodology employed for the *Preliminary Results* because it is consistent with the information [Commerce] requests in our questionnaire . . ." and acknowledging it did not have information necessary on the record to calculate the by-product offsets).

[20] Clearon claimed that by using the value of the downstream product ammonia sulfate in its calculation Commerce overstated the value of the by-products, ammonia gas and sulfuric acid. It requests remand so that Commerce may collect appropriate information and adjust the value to include only the by-products. Clearon Rule 56.2 Mot. at 20-25. Arch, Jiheng, and Kangtai argued that Commerce changed its methodology without providing an explanation and that it should value the by-products individually as it had done in previous review. Kangtai Rule 56.2 Mot. at 39-40; Arch & Jiheng Rule 56.2 Mot. at 24-31.

[21] Kangtai argued in its Motion for Judgment on the Agency Record that by valuing the offset based on the surrogate value for inputs, Commerce did not select the "best available information" for the by-product offset and that its determination was unlawful and unsupported by substantial evidence.   It also claimed that no party asked for the change and that Commerce conceded it was missing the information to effect its change. Kangtai Rule 56.2 Mot. at 39-40.

Kangtai's contention that Commerce did not properly brief the merits of its request lacks merit. In its remand request Commerce explained its change in methodology from the *Preliminary Results* to the *Final Results*. The court may reasonably deduce from the request that Commerce desires to reconsider its by-product methodology determination in light of the comments made Kangtai, Arch and Clearon, obtain additional information if necessary, and permit the parties to comment if additional information is collected.[22]

Commerce's concern is substantial and legitimate. Commerce provides evidence that it changed its methodology, and, as discussed above, addressing a change in methodology is a compelling justification for requesting a remand. The need for finality is not outweighed by the need for Commerce to ensure an accurate and consistent review result.[23] Here, Commerce is not attempting to "delay the day of reckoning" or asking for a "do-over anytime it wishes"[24] instead, its request to address a seeming departure from its past practice is consistent with the applicable statutory objective of "[securing] the just, speedy and inexpensive determination of every action and proceeding". *See* USCIT Rule 1. Commerce further appropriately limited the scope of its request to address a change in one methodology, the valuation of by-products, and it does not appear its

---

[22] Def's Rep. at 53-54. *See, e.g., Albemarle Corp. v. United States,* 37 CIT ___, Slip Op. 13-106 (Aug. 15, 2013).

[23] *Cf. Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 321 (1961) (noting the significance of the public interest in reaching what, ultimately, appears to be the right result in weighing a reconsideration request) (citation omitted); *see also SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011) (Commerce has an obligation to provide an explanation and address important factors raised by comments from petitioners and respondents), referencing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed. Cir. 2005), and *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997).

[24] *Corus Staal BV v. United States*, 29 CIT 777, 783, 387 F. Supp. 2d 1291, 1297 (2005) *aff'd*, 186 F. App'x 997 (Fed. Cir. 2006).

substantial and legitimate concern is frivolous or made in bad faith.  The court grants Commerce's

remand request.[25]  On remand, Commerce is requested to collect additional relevant information if

necessary, provide the parties an opportunity to comment on any new additional information, and

provide an explanation that addresses the parties comments either in their briefings if no additional

information is collected or as may be submitted to Commerce.

B.  Primary Surrogate Country Selection

Kangtai requests remand concerning Commerce's choice of the Philippines as the

primary surrogate country.  It argues that contrary to Commerce's findings, India is an economically

comparable country to the PRC and that India should have been selected as the surrogate country

for the review.  Supporting its claim Kangtai avers that Commerce's sole reliance on *per capita* GNI

to determine economic comparability is unreasonable, that Commerce misapplied its surrogate

country selection methodology, and that the range of *per capita* GNIs Commerce determined to be

proximate and economically comparable to the PRC is not supported by substantial evidence.

Kangtai Rule 56.2 Memo at 6-11(citations omitted).

---

[25]  Kangtai states the court must deny remand "to consider the issues anew and gather new information because [Commerce] . . . ultimately never answered the question of why [Commerce's] longstanding practice to value the immediate by-products generated in production of the subject merchandise should be abandoned" and because Commerce "unilaterally decided not to provide any reason whatsoever supported by the record that would have justified change in its practice." Kangtai Reply at 10.  The language of the remand request is appropriate.  Commerce requests remand to address the shortcomings in the *Final Results* that Kangtai points out: a lack of explanation for a change in by-product methodology.   In passing, this court notes Kangtai and Arch allege that the issue is not properly raised here, as Clearon failed to exhaust administrative remedies concerning its contention that the respondents responses were insufficient for the proper by-product valuation of ammonium sulfate. For this court to comment on these allegations at this point would be premature.

As discussed above, when valuing factors in AD reviews for NMEs Commerce must select data that are the "best available information" on the record. Commerce is also required under 19 U.S.C. §1677b(c)(4) to use "to the extent possible" surrogate country data that comes from one or more market economy countries that are (1) at "a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise". In making its surrogate country selection Commerce as a matter of policy applies a four-step procedural approach that is a "*sequential* consideration of the statutory elements". *See Import Administration Policy Bulletin 04.1: Nonmarket Economy Surrogate Country Selection Process* (Mar. 1, 2004) (italics added), *available at* http://ia.ita.doc.gov/policy/bull04-1.html (last visited July 10, 2014) ("Policy Bulletin 4.1"). First, Commerce's Office of Policy creates a list of potential surrogate countries that are at a "comparable level of economic development" to the NME country at issue ("potential surrogate country list"). Second, Commerce determines which countries on the potential surrogate country list are also producers of "comparable merchandise" to the merchandise subject to the AD order. Third, Commerce determines if any of the countries that satisfy steps one and two are also "significant" producers of the merchandise**.** Fourth, if more than one country exists in the selection process, Commerce chooses the country with the "best factors data" quality by evaluating the data's availability, reliability, and adequacy. Commerce generally selects a country from the potential surrogate country list, but will "go off" list if it determines all of the final listed countries lack sufficient data. Commerce also has a regulatory preference for valuing all surrogate values from one surrogate country. *See* 19 C.F.R. §351.408(c)(2).

Following this sequential approach Commerce listed the Philippines, Indonesia, Ukraine, Thailand, Columbia, and South Africa in its Surrogate Country Memorandum as those

countries it considered to be "economically comparable to [the PRC] and most likely to have good

data availability and quality" based on the 2011 World Development Report from the World Bank.

*See* Surrogate Country Memorandum, referencing World Development Report 2011, World Bank.

    1.  *Per Capita* GNI as Indicator of Economic Comparability

      Kangtai first challenges Commerce's sole reliance on *per capita* GNI to identify

economically comparable countries to the PRC, arguing Commerce's reliance on the measure is

unreasonable and contrary to law.[26]  Kangtai contends that Commerce has used India as the primary

surrogate country in the past 20 reviews, and that although it is aware that Commerce "always

included its form language about economic comparability and GNI even when consistently selecting

India as the primary surrogate country", *per capita* GNI is a crude benchmark for determining

economic comparability that does not consider all factors that contribute to determining if a country

has a comparable significant industry.  Kangtai Reply at 1; Kangtai Rule 56.2 Mot. 7-8.  To support

its claims Kangtai argues, without citation to the record, that "in modern times, [the PRC], India and

the United States are compared frequently and generally as leading world economies", that India is

"one of the world's largest countries with one of the largest economies", and that "it is self-evident

that India is more economically developed than the Philippines but only due to its large population

its *per capita* GNI ranking falls below the Philippines."  Kangtai Rule 56.2 Mot. at 7-8**.**

      The court finds Kangtai's arguments unpersuasive, and Commerce's reliance on *per*

*capita* GNI reasonable and in accordance with law.  In the *Final Results* Commerce explained that

its selection of economically comparable countries for the review was consistent with its "long-

---

    [26]  Kangtai Rule 56.2 Mot. at 7, referencing 19 U.S.C. §1516a(b)(1)(B)(I) and *Chevron U.S.A., Inc.*, *supra*, 467 U.S. 837 (1984).

standing and predictable practice of selecting economically comparable countries on the basis of

GNI".[27]  Commerce is provided substantial deference in both the interpretations of its AD statutes

and the methodology it applies to fulfill its statutory mandate, and under the second prong of

*Chevron* its interpretation will be sustained if it is found to be reasonable.[28]  Commerce is not

required by statute or regulation to select the same surrogate country it did in previous reviews, or

the country with largest economy, or the most populated country, as Kangtai suggests.  Rather, in

*each* segment of the proceeding Commerce must value the factors of production from a surrogate

country that is *at a level of economic development comparable to that of the NME* and a *significant*

*producer of comparable merchandise*.  *See* 19 U.S.C. §1677b(c)(4); *see also* 19 C.F.R. §351.408(b)

(italics added).  The applicable statute does not expressly define the phrase "level of economic

development comparable " or what methodology Commerce must use in evaluating the criterion.

19 U.S.C. §1677b(c)(4).  19 C.F.R. §351.408(b) states that although other information may be

considered when Commerce determines if a country is at a level of economic development

comparable to the NME under 19 U.S.C. §1677b(c)(2)(B) or 19 U.S.C. §1677b(c)(4)(A), primary

emphasis will be placed on *per capita* GDP as the measure of economic comparability.  Commerce

later amended its methodology and explained that it now "uses *per capita* GNI, rather than *per*

*capita* GDP, because while the two measures are very similar, *per capita* GNI is reported across

---

[27]  I&D Memo at cmt. 2, referencing *Magnesium Metal From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 65450 (Oct. 25, 2010), and accompanying issues and decision memorandum at cmt. 4.

[28]  *United States v. Eurodif S.A.*, *supra*, 555 U.S. at 316; *accord Timken Co.*, *supra*, 354 F.3d at 1342 ("any reasonable construction of the statute is a permissible construction"), citing *Torrington*, *supra*, 82 F.3d at 1044, and *SKF I*, *supra*, 254 F.3d at 1027.

almost all countries by an authoritative source (the World Bank), and because the Department

believes that the *per capita* GNI represents the single best measure of a country's level of total

income and thus level of economic development." *Antidumping Methodologies in Proceedings*

*Involving NonMarket Economy Countries: Surrogate Country Selection and Separate Rates*, 72 Fed.

Reg. 13246, 13246 n.2 (Mar. 21, 2007) (req. for cmts.).

       Kangtai suggests that instead of using GNI to measure economic comparability,

Commerce should have considered the chemical industry under review.  Pointing to Indian data

available for the subject merchandise Kangtai argues that India "has, and has had, a large and

established chemicals industry from which to draw surrogate values - far more established than the

other countries under consideration" and that "[N]o other country comes close to this amount of

quality data."[29]  The metric proffered by Kangtai, however, only addresses the second prong of the

surrogate country criteria which requires a country be a "significant producer of comparable

merchandise" without addressing economic comparability.[30]

       The court in *Jiaxing Brother* recently addressed arguments similar to those raised

by Kangtai.  There the plaintiff claimed India's steel industry was more comparable to the PRC's

than it was to the selected surrogate country, Thailand, regardless of the *per capita* GNI of each of

the countries. It averred that Commerce's use of GNI as a measure of economic comparability was

---

[29] Kangtai claims that there is no good substitute for India that complies with Commerce's
policy of selecting a country that provides both "good data availability and quality", and that both
Commerce and the interested parties have voiced difficulties about finding surrogate values for the
subject merchandise beyond those which come from the India data.  Kangtai 56.2 Mot. at 7-9
(citations omitted).

[30] *See Jiaxing Brother Fastener Co. v. United States*, 38 CIT___, Slip Op. 14-12 (Feb. 6,
2014) (hereinafter "*Jiaxing Brother*") at 10, referencing 19 U.S.C. §1677b(c)(4)(B).

unreasonable and that it should have instead applied an industry-sensitive approach to determine economic comparability. *See Jiaxing Brother*, *supra*, Slip Op. 14-12 at 9-10. The court questioned how the industry-sensitive approach offered by the plaintiff would be administrable across all NME cases, noting the approach both "leaves open to debate which metrics Commerce should utilize to identify economically comparable countries" and makes identifying a surrogate country early in the proceedings "difficult if not impossible." *See id.* at 11. Determining that Commerce's use of *per capita* GNI was a reasonable interpretation of its statutory mandate to identify and select a surrogate country at a "level of economic development comparable" to the NME, the court found that *per capita* GNI is a "consistent, transparent, and objective metric to identify and compare a country's level of economic development." *Id.* at 10. The *Jiaxing Brother* decision is persuasive on this issue and Commere's use of GNI as a measure of economic comparability in the instant review is reasonable interpretation of the statute and is in accordance with law.

    2.   Application of Methodology for Selecting a Primary Surrogate Country

             Kangtai claims Commerce erred in applying its surrogate country selection methodology resulting in the improper elimination of India as a surrogate country. Kangtai unconvincingly argues the court is split on this issue. It contends that the *Amanda Foods*[31] and *Ad Hoc Shrimp*[32] decisions correctly interpreted the statue by requiring a "weighing" of the three criteria - economic comparability, significant producer of comparable merchandise, and data availability –

---

[31] *Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT 1407, 647 F. Supp. 2d 1368 (2009) (hereinafter "*Amanda Foods*").

[32] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 CIT ___, 882 F. Supp. 2d 1366, 1375 (2012) (hereinafter "*Ad Hoc Shrimp*").

while the *Jiaxing Brother* and *Foshan Shunde*[33] decisions, which Commerce followed in the instant review, misconstrued the statute by approaching *per capita* GNI ranking as threshold statutory criterion.  Kangtai Reply at 3-9.

      The court is not split on the application of the surrogate country eligibility criteria as Kangtai suggests.  All four cases approach the selection process by treating the *per capita* GNI ranking as a threshold statutory criterion that must be met before the other criteria are considered. The cases are, however, distinguishable as they address issues in two different stages of the surrogate country selection process.  In *Foshan Shunde* and *Jiaxing Brother*, as in this matter, the court addressed the argument that a country which did not meet the threshold *per capita* GNI ranking criterion and was not on the potential surrogate country list in the Surrogate Country Memorandum, should still be considered economically comparable to the NME.[34]  In *Amanda Foods* and *Ad Hoc Shrimp,* the court addressed challenges to Commerce's surrogate country selection between two countries listed on the Surrogate Country Memorandum which had met the threshold *per capita* GNI ranking criterion.

      The plaintiff in *Amanda Foods* challenged Commerce's selection of Bangladesh as the primary surrogate country for Vietnam, and contended Commerce erred in applying Policy

---

[33] *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 37 CIT ___, 896 F. Supp. 2d 1313 (2013) (hereinafter "*Foshan Shunde*").

[34] *See id.* at 1318-25 (plaintiffs unsuccessfully argued that Commerce's selection of a country listed on the potential surrogate country list in the Surrogate Country Memorandum, Indonesia, was unreasonable and accordingly unsupported by substantial evidence and that Commerce should have instead selected India, a country not on the list); *see also Jiaxing Brother*, *supra*, Slip Op. 14-12 at 4-14 (plaintiffs unsuccessfully argued that Commerce's selection of a country listed on the potential surrogate country list in the Surrogate Country Memorandum, Thailand, was unreasonable and accordingly unsupported by substantial evidence and that Commerce should have instead selected India, a country not on the list).

Bulletin 4.1 in its surrogate country selection by not addressing the GNI differential between

Vietnam and Bangladesh as compared to the differential between Vietnam and another country on

the potential surrogate country list, India.  The court ordered remand, finding that Commerce did

not provide more than conclusory reasoning of why the GNI discrepancy between two countries on

the potential surrogate list did not affect Commerce's final surrogate country selection:

> Nor has Commerce explained why the difference between Bangladesh and Vietnam, in *per capita* GDP, is not relevant in this case or why the difference in economic similarity to Vietnam is outweighed by the differences in quality data between Bangladesh and India.  Rather, without explanation, Commerce has adopted a policy of treating all countries *on the surrogate country list* as being equally comparable to Vietnam.   As Commerce's chosen designation has not been supported by any justification or evidence at all, it is not supported by substantial evidence.

> Significantly, [Commerce's] Policy Bulletin states that each Surrogate Country Memorandum must explain how the chosen country satisfies each of the statutory criteria.   In accordance with [Commerce's] own policy, therefore, the Surrogate Country Memorandum must explain why its chosen surrogate country is at a level of economic development comparable to Vietnam.  The memorandum in this case does not do so.  Accordingly, the court cannot find on this record that Commerce's surrogate country selection is supported by substantial evidence.

*Amanda Foods, supra*, 33 CIT at 1413, 1415, 647 F. Supp. 2d at 1376-78 (citations omitted; italics

added).

In *Ad Hoc Shrimp* the plaintiff argued Commerce should choose Thailand rather than

India from the potential surrogate country list as the primary surrogate country for the PRC. The

court evaluated Commerce's policy of treating all countries on the potential surrogate list as

equivalent in terms of economic comparability and ordered remand after finding Commerce's

selection of India was not supported by a reasonable reading of the record:

> Commerce's policy of disregarding relative GNI differences *among potential surrogates* for whom quality data is available and who are significant producers of comparable merchandise is not reasonable, because it arbitrarily discounts the value

of economic comparability relative to the remaining eligibility criteria (*i.e.*, significant production of comparable merchandise and quality of data).  While it is true, as Commerce emphasizes, that the most economically comparable country would not be a reasonable surrogate choice if the dataset from that country was inadequate, this is equally true of the remaining criteria.  Thus, for example, the most economically comparable country would be an unreasonable surrogate choice if it were not a significant producer of comparable merchandise, and the country with the absolute best dataset would similarly be an unreasonable surrogate choice if it were not economically comparable to the NME in question. Indeed, Commerce's own policy suggests that none of the three surrogate country eligibility criteria -- economic comparability, significant production of comparable merchandise, and quality data -- is preeminent.

Because none of Commerce's three surrogate country eligibility criteria is preeminent, it follows that relative strengths and weaknesses among *potential surrogates* must be weighed by evaluating the extent to which the *potential surrogates* satisfy each of the three criteria.  If, for example, one *potential surrogate* has superior data quality and another is closer in GNI to the NME in question, Commerce must weigh these differences when selecting the appropriate surrogate. An unexplained and conclusory blanket policy of simply ignoring *relative GNI comparability within a particular range of GNI values* does not amount to a reasonable reading of the evidence in support of a surrogate selection *where more than one potential surrogate within that GNI range* is a substantial producer of comparable merchandise for which adequate data is publicly available.  Rather, in such situations, Commerce must explain why its chosen surrogate's superiority in one of the three eligibility criteria *outweighs another potential surrogate's superiority* in one or more of the remaining criteria.

*Ad Hoc Shrimp*, *supra*, 36 CIT at ___, 882 F. Supp. 2d at 1374-75 (citations omitted; italics added).

Kangtai's attempt to demonstrate a split in the court's jurisprudence is misplaced.

The issue before the court in *Amanda Foods* and *Ad Hoc Shrimp* was not the initial placement of a

country on the potential surrogates list as it was in *Foshan Shunde* and *Jiaxing Brother*, but rather

the merits of each of the potential surrogates on the list relative to each other.[35]  Commerce complied

---

[35]  *See* Commerce Policy Bulletin 4.1; *see also, e.g., Ad Hoc Shrimp Action Committee v. United States,* Slip Op. 14-59, 38 CIT ___ (May 29, 2014) at 11 n.17 (discussing the application of the *per capita* GNI threshold statutory criterion versus a later weighing of the three criteria):

[I]mportantly, Bangladesh's relatively less similar GNI to that of [the NME] (when

(continued...)

with the applicable statute and regulation in applying the surrogate country methodology in the review.

Kangtai also unconvincingly argues that the surrogate country selection methodology Commerce applies results in "a surrogate country list that changes from review to review" and that it contravenes the importance of the AD law which is selecting a "reliable, consistent surrogate for [the PRC]".  It claims that it was prevented from receiving notice of Commerce's change in surrogate country and that parties have no way of predicting what the normal value of their products will be in each segment of the review.  Kangtai Rule 56.2 Mot. at 10-11; Kangtai Reply at 2-3.

As discussed above, Commerce is not required by statute or regulation to select the same potential surrogate countries or final surrogate country in each review, nor is it required to select the same surrogate country from the *Preliminary Results* to the *Final Results*.  In each review, parties are given opportunities to present and comment on surrogate country selection and are presumed aware of the possible countries that may be selected as well as of the possibility that the selected surrogate country may change from review to review.  This is true for the present review where Kangtai commented on the surrogate country selection after being informed early in the proceedings of the potential countries that may be selected.  *See* Surrogate Country Memorandum at 5; *see* Request for Surrogate Country Cmts. (Oct. 28, 2011), PDoc 37; *see generally* Kangtai Sur.

_____

[35] (...continued)
compared with India's GNI) does not affect Commerce's determination that all three potential surrogate countries independently fell within the range of economic comparability to [the NME], and therefore that data from all three countries would satisfy that threshold statutory requirement.  The appropriateness of placing Bangladesh on the initial potential surrogates list (based on Commerce's finding that Bangladesh's GNI fell within the range of economic comparability to [the NME]) is uncontested . . . [and]  Commerce's initial placement of Bangladesh on the potential surrogates list is not the issue before the court.

Country Cmts. (Dec. 19, 2011), PDoc 58; Kangtai Sur. Value Sub. (Jan. 9, 2012), PDocs 69, 70;

Kangtai Sur. Value Sub. for Final Results (Sept. 5, 2012), PDocs 116, 117.[36] Although, Kangtai

may not be completely certain of the country Commerce will choose as a surrogate, as a participant

in previous administrative reviews it is aware of the process and methodology Commerce follows,

and that the surrogate country selection occurs as part of a retroactive process where Commerce

applies duties to entries after they have been sold.

   3.   Range of GNI Used by Commerce to Determine Economically Comparable Countries

            Kangtai next challenges the range of GNI Commerce used to make its surrogate

country selection and to determine that India was not a level of economic development comparable

to the PRC.   Arguing Commerce's decision to eliminate India was not supported by substantial

evidence, Kangtai claims that Commerce has failed to provide any analysis explaining why countries

are economially comparable to the PRC "if they are within a particular range of GNI, as opposed

to a larger or smaller range" or why the range "changed from year to year".[37]

---

[36] Kangtai argues The Omnibus Trade Act Report is evidence that Congress voiced similar fairness concerns about the retroactive application of factors of production in the surrogate country selection methodology. *See* Kangtai Rule 56.2 Mot. at 10-11, citing Omnibus Trade Act Report S. Rep. No. 100-71 at 106 (1987). However; Kangtai's argument is based on a selective reading of the report, which addresses concerns that imports from the PRC not be unfairly disadvantaged by the methodology when "price differences can be accounted for in whole or in part by quality differences in the imported merchandise":

> The Committee is particularly concerned that the imports from certain nonmarket economy countries, such as the People['｜s Republic of China, not be unfairly disadvantaged by the use of the new methodology [the factors of production methodology] where price difference can be accounted for in whole or in part by quality differences in the imported merchandise. [Commerce] should ensure that, in computing the trade-weighted average price, it only uses prices that are in fact from arms-length sales to unrelated parties.

[37] Kangtai Reply at 1, referencing *Consol. Edison Co.*, *supra*, 305 U.S. at 229. *See* Kangtai
(continued...)

Commerce is granted broad discretion in its selection of surrogate countries for AD proceedings, and the court "will not impose its choice of which economy is more comparable . . . provided the choice made by Commerce is sufficiently reasonable and supported by evidence." *See* 19 U.S.C.§1516a(b)(1)(B); *see also Technoimportertexport and Peer Bearing Co. v. United States*, 15 CIT 250, 255, 766 F. Supp. 1169, 1175 (1991) (citation omitted). Commerce is not required to set a fixed range of GNIs into which potential surrogate countries must fall, but it must provide a reasoned explanation which permits the court to determine the process by which it reached its result was logical and rational, and this explanation must be supported by the administrative record.[38]

Commerce created the potential surrogate country list for the segment of the review at issue without explanation. The Surrogate Country Memorandum which contains the potential surrogate country list states:

> With regard to the first statutory requirement, the six countries on the non-exhaustive list below are at a level of economic development comparable to [the PRC] in terms of *per capita* gross national income (GNI). *Per capita* is the primary basis for determining economic comparability.
>
> This list provides you the countries that are economically comparable to [the PRC] and the most likely to have good data availability and quality. You may also

---

[37] (...continued)

Compl. ¶ 14 ("[t]he Department's conclusion that India was not at a level of economic development comparable to [the PRC] was not supported by substantial evidence"), referencing 19 U.S.C. §1677b(c)(1) and 19 U.S.C. §1677b(c)(2)(B) (requiring that the Department select surrogate values from "one or more market economy countries that are at a level of economic development comparable to that of" the PRC).

[38] *See, e.g.*, *Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1269-70 (2006); *see also Ad Hoc Shrimp*, *supra*, 36 CIT at ___, 882 F. Supp. 2d. at 1374, citing *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational").

consider other countries on the case record if the record provides you adequate information to evaluate them.

Surrogate Country Memorandum.  While dismissing Kangtai's argument that India is economically comparable to the PRC in its *Final Results,* Commerce again made its determination without explanation:

> In the *Preliminary Results* [Commerce] stated that, for the purpose of selecting a surrogate country, Colombia, Indonesia, the Philippines, South Africa, Thailand and Ukraine were equally comparable to the PRC in terms of economic development. The list is comprised of countries that are proximate to the PRC in terms of GNI . . .. [T]he list did not include India because India's *per capita* GNI did not fall within the range of countries proximate to the PRC.

> [Commerce] finds that the selection of the range of economically comparable countries base on GNI, included in the Surrogate Country Memorandum, is reasonable and consistent with the Tariff Act of 1930, as amended.

I&D Memo at cmt. 2.

Even assuming, *arguendo*, the court could accept the *post hoc* rationalization Commerce provides in its Rule 56.2 response,[39] Commerce fails to provide India or the PRC's GNI ranking, India's GNI, or analysis, beyond conclusory statements, explaining why the GNIs of the countries on the potential surrogate list qualify as economically comparable and proximate to the PRC's GNI while India's GNI does not.[40]  Commerce instead has advanced an explanation that

---

[39]  *See* Def's Resp. at 8 ("Although Commerce had selected India as the primary surrogate country in all of the earlier administrative reviews of this order, India became less economically comparable to [the PRC] over time.  Indeed, given the *per capita* GNI data in the World Bank Report, India's and [the PRC]'s *per capita* GNI rankings had moved so far apart that Commerce dropped India from its surrogate country list, substituting other, more comparable countries.") & 11 (the PRC "has a large population and a GNI that is much higher than that of India").

[40]  *Atcor, Inc. v. United States*, 11 CIT 148, 154, 658 F. Supp. 295, 300 (1987) ("[I]n reviewing agency action, the Court must base its decision upon the administrative record.  New evidence may not be received.  The Court must rely upon the rationale articulated by the agency.

(continued...)

amounts to "we did it because it is our policy to do it".  This explanation is not reasonably adequate

to support a conclusion and cannot serve as a basis for Commerce's reasoned decision-making.  *See*

*Ad Hoc Shrimp*, *supra*, 36 CIT at ___, 882 F. Supp. 2d at 1374, referencing *Consol. Edison Co.*,

*supra*, 305 U.S. at 229 (1938).

      After reviewing the record, the court also fails to find evidence on the record that

could reasonably support Commerce's conclusion.[41]  The administrative record consists of "a copy

of all information presented to or obtained by [Commerce] during the course of the administrative

proceeding".   19  U.S.C.  §1516a(b)(2)(A)(i).    Although  Commerce  can  and  does  take  into

consideration its policies and methodologies as expressed in different administrative case precedent

when making its determination, it cannot take the factual information underlying those decisions into

consideration unless those facts are properly on the record of the proceeding before it.[42]  Commerce

has relied upon the World Development Report to determine those countries whose GNIs it views

to be "proximate" and economically comparable to the PRC.  It is therefore a part of the record.  The

record, however, does to reflect its inclusion.  If Commerce is in possession of such evidence then

---

[40]  (...continued)
It may not rely upon *post hoc* rationalizations."), referencing *Abbott v. Secretary of Labor*, 3 CIT
54, 55 (1982), and *ILWU Local 142 v. Donovan*, 10 CIT 161 (1986).

[41]  *PPG Indus. v. United States*, 978 F.2d. 1232, 1237 (Fed. Circ. 1992) (the court evaluates
if the evidence on the record "could reasonably lead to [Commerce's] conclusion") (citations
omitted).

[42]  *Gourmet Equip. Taiwan Corp. v. United States*, 24 CIT 572, 577-78 (2000) ("Commerce's
longstanding practice, upheld by this court, is to treat each segment of an antidumping proceeding,
including the antidumping investigation and the administrative reviews that may follow, as
independent proceedings with separate records and which lead to independent determinations").

it needs to incorporate it into the record so that the court may determine if that evidence could reasonably lead to Commere's conclusion.[43]

Commerce's selection of the GNI range for economically comparable countries on the potential surrogate country list and its determination that India does not qualify as a economically comparable country is not supported by a reasonable analysis and record evidence. For these reasons the court remands this issue to Commerce to (1) provide a reasonable explanation why the range of the GNIs listed on the Surrogate Country Memorandum qualify the countries as proximate and "economically comparable" to the PRC, including a discussion of why it believes India's GNI does not, if that continues to be Commerce's determination, qualify it as an economically comparable country, and (2) place the data on the record that it relied upon to make its determination.

### C.  Surrogate Value Selections

The parties also contest Commerce's surrogate value selection of the FOPs chlorine, hydrogen gas, sodium hydroxide, electricity, and urea.  As noted above, when valuing FOPs Commerce must select the "best available information regarding the values of such factors in a market economy or countries", 19 U.S.C. §1677b(c)(1)(B), and it has regulatory preference for valuing all FOPs from a single surrogate country.  19 C.F.R. §351.408(c)(2) (Commerce will "normally value all factors in a single surrogate country").  Commerce is provided substantial

---

[43] *See, e.g., Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377, 1379 (Fed. Cir. 2012) (stating that "[t]he grounds upon which an [agency action] must be judged are those upon which the record discloses that [the] action was based" and "review of an administrative decision must be made on the grounds relied on by the agency" such that "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis") (citations omitted).

discretion in its choice, but the court must be satisfied that when viewing the record as a whole a reasonable mind could conclude the best available information was selected, and Commerce's selection must be supported by substantial evidence and in accordance with law.  *See Dorbest Ltd.*, *supra*, 30 CIT at 1676-77, 462 F. Supp. 2d at 1269.

   For the court to determine that a reasonable mind could conclude that the surrogate value selections for chlorine, hydrogen gas, sodium hydroxide, electricity, and urea were the best available information Commerce must justify its selections by conducting a "fair comparison of the data sets on the record".[44]  This court is unable to make this determination considering that Commerce has a preference for valuing all FOPs from a single country, and an evaluation of this preference is part of Commerce's process of comparing and selecting potential surrogate values. Commerce may decide to select a different surrogate country on remand and in doing so will need to analyze its surrogate value selections for the FOP anew.  The court accordingly defers its determination on these issues pending the completion of the redetermination.

## IV.  *Conclusion*

   For the reasons set forth above, this matter must be, and hereby is, remanded to Commerce for further consideration of the surrogate financial ratios, by-product valuation methodology, intra-company transport methodology, and the surrogate country selection in light of Clearon, Kangtai, Arch and Jehing's arguments and all relevant intervening legal developments. The results of remand shall be due October 21st, 2014, comments on the remand results shall be due

---

  [44]  *See Amanda Foods*, *supra*, 33 CIT at 1417, 647 F. Supp. 2d at 1378-79, referencing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998), and *Allied Pac. (Dalian) Co. v. United States*, 30 CIT 736, 757, 435 F. Supp. 2d 1295, 1313-14 (2006).

30 days from the date the remand results are filed with the court, and rebuttal commentary shall be

due 15 days thereafter.

**So ordered.**


/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: July 24, 2014
         New York, New York